M. S. MILLIKIN, and M. S. Millikin and Dorothy P. Millikin, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 8445.

United States Court of Appeals Fourth Circuit.

Argued Jan. 5, 1962.

Decided Jan. 31, 1962.

B. Gerard Hartzog, Columbia, S. C., for petitioners.

Arthur E. Strout, Atty. Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, and Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The petitioners seek a review of a decision of the Tax Court determining deficiencies of income tax for the years 1945 through 1950, and approving the Commissioner's imposition of fraud penalties. Its determination was based upon net worth computations. The principal contention here revolves around the husband's claim to have had a cash hoard of $40,000 at the opening of the net worth period. We think the evidence justified the finding of the Tax Court that he had no more than $6,000 in cash at that time, and that it supports the other findings and conclusions of that court.

The husband filed an individual return for each of the years 1945–1949, inclusive, and the husband and wife filed a joint return for 1950. These returns disclosed, using approximate figures, net income of $1600 in 1945, $13,000 in 1946, $3700 in 1947, a loss of $7300 in 1948, net income of $3,000 in 1949, and of $5200 in 1950. By computing the increased net worth on an annual basis,

to which was added nondeductible expenses in each year, the Tax Court determined that there was net income in each of these years of $18,600, $41,000, $23,400, $16,400, ($1400), and $13,700, respectively.

In making these computations, the Commissioner and the Tax Court had information of the exact amount of the cash in bank at the opening and close of each annual period. The Commissioner gave no credit for any undeposited cash hoard as of January 1, 1945, but the Tax Court gave Milliken credit for $6,000 as of that date. The Tax Court did not give Milliken credit for the value of his equity in certain record playing machines he owned in January 1945. The failure to give him credit for a larger amount of undeposited cash and for the value of his equity in the record playing machines is the principal basis of his attack upon the decision of the Tax Court.

Milliken testified that on January 1, 1945, he had $40,000 in currency. He explained the accumulation of this cash hoard by consistent savings through frugal living during the 20-year period following his marriage to Dorothy P. Milliken in 1925. In the summer of 1944, he testified, this hoard was in small bills, which he took to the Federal Reserve Bank in Charlotte, North Carolina, where he exchanged the small bills for others of larger denomination. This testimony was supported by a teller of the Federal Reserve Bank, who testified that he recalled that Milliken did come to the bank with a bag of small bills which were exchanged for bills in denominations of $50 and $100. He testified that to count the bills and make the exchange required some thirty minutes, from which he estimated that the total amount involved exceeded $30,000, but he had no other recollection of the amount of the money. He was unable to recall just when this transaction occurred, though he testified it was after January 19, 1942 and prior to 1948.

Another official of the Federal Reserve Bank testified that, beginning on May 21, 1945, records were made of all such transactions when the amount involved was as much as $1,000. He had searched the records of the bank and found no record of any such exchange by Milliken. From this testimony, Milliken reasons that the exchange recalled by the teller must have occurred prior to May 21, 1945, and that this testimony strongly corroborates his testimony that he had a cash hoard of at least $40,000 on January 1, 1945.

Milliken's financial history weighs heavily against the claim, however.

Petitioner finished only the ninth grade in school. At the age of twenty, in 1925, he married Dorothy. Thereafter, he went into the dry cleaning business in Hamlet, North Carolina, and for some years worked as a part time brakeman on a railroad. His earnings as a brakeman never exceeded $600 in any of these early years, and in 1931 amounted to only $69.96. In 1932, the dry cleaning business was declining, so he sold it out, and the petitioner moved to Hickory, North Carolina, where Milliken became employed as assistant manager of a retail store at a salary of $12 to $15 per week. This employment terminated when his employer went into receivership.

In 1933, Milliken, operating as Milliken Music Company, went in the business of supplying coin-operated phonographs and pinball machines to locations controlled by others. The usual agreement, under which these machines were operated, divided the gross receipts of each machine on the basis of fifty per cent to Milliken and fifty per cent to the operator of the premises.

This coin-operated machine business, referred to as the "music business," petitioner sold in September 1941 for $2500 in cash and the assumption by the purchaser of the balance of $8,317.77 due on equipment purchase contracts. The equipment at that time consisted of some forty-seven coin-operated machines, some related equipment, a pickup truck, and a typewriter.

Millikin then moved to Georgia where he purchased a coin-operated machine business, for which he paid $5,000 in cash and agreed to pay $700 per week until the balance of the purchase price, undisclosed on this record, was paid. The volume of the business decreased, and Millikin had difficulty in maintaining his payments. In 1942, he turned back this business to the person from whom he had bought it, receiving for himself about $2500.

Millikin then returned to Hickory, North Carolina, and reacquired his old music business from its earlier purchaser, who had been unable to make any money from it. To reacquire his old music business, Millikin paid $3600 in cash on March 25, 1942, and assumed the payment of a balance of $4,389.51, due upon purchase contracts for twenty-three phonographs.

Under date of February 9, 1942, an instrument was executed by the petitioner in which it was recited that the conditions of the equipment purchase contracts of his reacquired Hickory business had not been performed, that the petitioner desired to consolidate the indebtedness on those contracts and to arrange for an extension of the term of payment. There is then described in the instrument some twenty-three Wurlitzer phonographs, the equipment on which the balance of $4,389.51 was still due on the purchase price. That balance, petitioner agreed to pay in sixteen monthly instalments of $274.34, (the last instalment was to be $274.41), the first instalment being due on February 11, 1942. This instrument was recorded on March 25, 1942, the date on which he paid the cash consideration to reacquire his old business.

In 1943, petitioner placed some of his coin-operated phonographs and pinball machines in officers' and enlisted men's clubs at Camp McCall, North Carolina. At about that time, or shortly thereafter, he also began to purchase slot machines and furniture for clubs at Camp McCall, under arrangements by which he received a percentage of the receipts of the machines as their purchase price. There were also agreements that he would keep the machines in operating condition, for which he was to receive a percentage of their receipts or a flat fee.

Meanwhile, sometime prior to World War II, Millikin had a half interest in a flying school at Beacon Field, Hickory, North Carolina. At different times, Millikin and his partner owned four airplanes. This operation ceased when the partner went into military service, and the record indicates the business was not a financial success.

In October 1942, Millikin began to work again as a brakeman on a railroad. He continued in that employment through April 1943. His average earnings from the railroad during this seven-month period amounted approximately to $265 per month.

Mrs. Millikin had begun the operation of a beauty salon in Hickory in 1933 or 1934. This shop was a going business on January 1, 1945, the opening date of the net worth period. She sold it on March 14, 1946 for $3750.

Millikin had filed no federal income tax return prior to 1940. He filed returns for 1940 and 1941, but showed no tax due. He filed no return for 1942. He filed returns for 1943 and 1944, showing taxes due, respectively, of $1362.91 and $858.53. Mrs. Millikin filed an income tax return for 1945, in which she showed a profit from the operation of her beauty salon of $594.73.

Intangible property tax returns filed in North Carolina by Millikin for the years 1947 and 1948 disclosed no cash on hand as of the end of either of those years.

It is clear on this record that sometime after Millikin began to place his coin-operated machines in clubs at Camp McCall, and later at other military posts, his cash receipts and his earnings greatly increased. It is equally clear that until then his cash receipts and his earnings, and those of Mrs. Millikin, had been very modest. His dry cleaning business, the flying school, and the coin-operated

machine business in Georgia, had all been financial failures. What little he earned as a part time brakeman on railroads was far less than enough to support himself and his family in any year. They could hardly have done more than exist on his wages when he was employed in the retail business. His music business in Hickory, which appears to have become so successful during the net worth period, was not very successful in earlier years. This is established by the terms of its sale when he sold it in 1941 and when he reacquired it in 1942. Its operator in the interim testified that he was unable to make any money out of it, and, in 1942, Millikin, himself, was forced to arrange an extension of time to pay a balance of $4,389.51 due upon his phonographic equipment. Mrs. Millikin's contributions to the family earnings were not great. Her income tax return in 1945 discloses a net income of less than $600. Her failure to file returns for earlier years and the fact that she sold that business in 1946 for $3750 indicate that business was not very profitable. They were not the recipients of any substantial gift or inheritance.

All of this evidence strongly indicates that the petitioners were in debt and without very large income very shortly prior to the opening of the net worth period. It makes incredible his assertion that, during the years 1925 to 1943 he was consistently saving and accumulating a cash hoard, which, by the end of 1944, amounted to more than $40,000.

In the face of this evidence, the testimony of the bank officials did not necessarily require a finding by the Tax Court that Millikin was the owner of undeposited currency exceeding $30,000 at the end of 1944. It is quite possible that he could have exchanged a large amount of money at about that time, as the testimony of the bank officials indicates, but, in the light of all of the other evidence, proof of the fact of such an exchange did not conclusively establish ownership of the exchanged fund. The petitioner did not claim that he had extraordinary earnings during 1943 or 1944 which could begin to account for such a sum. His tax returns indicate that he did not. His indebtedness in 1942, which he could not punctually meet without an extension of time, and his financial history justify the finding that he had no cash in 1942, after the down payment to reacquire his coin-operated machine business.[1]

It may be that he was able to accumulate some cash in 1943 and 1944. That he had some cash on hand in January 1945 is suggested by the fact that in the summer of 1945, he purchased, at a cost of $12,431.25, United States savings bonds, some in the joint names of the petitioners, some in the joint names of their daughters, and some in the joint names of the mother and the daughters. Because of the bond purchases and the fact that some cash may have been saved during the years 1943 and 1944, the Tax Court allowed the petitioner a credit of $6,000 for undeposited cash on hand as of January 1, 1945.

Upon this record, we think, under the Cohan rule,[2] the finding was well within the latitude permitted the finder of fact.

There was no direct testimony that Millikin had on hand on January 1, 1945 the specific amount of currency which the Tax Court found he had. Such testimony is not essential to adequate support of the finding.[3] When the Tax Court became convinced by the evidence that Millikin had some cash, but less than

1. The factual issue was not unlike the one we recently considered in Gatling v. Commissioner, 4 Cir., 286 F.2d 139. Similar factual questions where the taxpayer claimed to have a cache of currency at the opening of the net worth period were considered in Anderson v. Commissioner, 5 Cir., 250 F.2d 242; Epstein v. United States, 6 Cir., 246 F.2d 563; Davis v. Commissioner, 7 Cir., 239 F.2d 187; Bodoglau v. Commissioner, 7 Cir., 230 F.2d 336; Kite v. Commissioner, 5 Cir., 217 F.2d 585.

2. Cohan v. Commissioner, 2 Cir., 39 F.2d 540.

3. See the cases cited in footnote 1, supra.

the large amount he claimed to have had, it was required to determine a specific amount in dollars somewhere between the extremes of the Commissioner's determination of no cash and the taxpayers' claim. It could do that only by resort to an exercise of judgment based upon the available evidence in the record. That is what the Cohan rule authorizes.

■ A more precise finding could have been made only upon a more precise record, and the deficiencies in the record of the proceedings in the Tax Court were attributable to the deficiencies in the taxpayers' own financial records. Under these circumstances, the taxpayers are in no position to contend that their testimonial claims precluded a finding by the Tax Court that their opening currency hoard was not as large as their claim.

The Tax Court finding was based upon a reasonable estimate. The detailed evidence of the taxpayers' previous financial history gives it adequate support. If we were inclined to the belief that the sum was larger or smaller than the Tax Court found, we could not indulge our inclination to the extent of assumption of the role of the fact-finder.

■ The taxpayers next complain of the omission from the opening net worth statement of any amount representing the value of their equity in the equipment they reacquired in 1942 when Millikin repurchased his old music business at a gross cost of $7,989.51, including the deferred balance for the payment of which Millikin arranged extended terms during that year.

In the original Revenue Agent's Report, this equipment was shown as an asset owned by the taxpayers on January 1, 1945, but against it there had been set up a depreciation reserve account in an amount equal to the gross reacquisition cost. The result of this treatment was to attribute no value to the taxpayers' equity in this equipment. In a Supplemental Revenue Agent's Report, these items were omitted, an omission which the Tax Court found technically incorrect, but unprejudicial, for it did not affect the net worth computation.

Here, the taxpayers assert that the equity in this equipment was of some value at the opening of the net worth period, but they offered no evidence of any realizable market value for that equipment as of that date, nor did they offer any evidence requiring the Tax Court to overturn the Commissioner's determination that the entire reacquisition cost should have been fully depreciated by January 1, 1945. Rather, because they were allowed to deduct depreciation at the rate of twenty per cent per annum[4] on new equipment subsequently purchased, they contend that the reacquisition cost of the old machines should have been depreciated on a five-year basis. The machines were not new when reacquired, however, and there is nothing in the record which required the Tax Court to overturn the Commissioner's finding that their useful life did not extend beyond January 1, 1945. Neither the Commissioner nor the Tax Court were required to attribute to old and used equipment the same useful life which they attributed to new equipment of the same class.

Next, the taxpayers complain of the Tax Court's findings of nondeductible living expenses.

■ The Commissioner had determined nondeductible living expenses ranging as high as $19,522.20 in 1947. He based his determinations upon an analysis of bank accounts during which he treated as personal expenses the amount of certain checks which the taxpayers withheld from the agent on the ground that they were personal. The Tax Court substantially reduced these determinations, fixing the living expenses at $4,000 in 1945, 1946 and 1947, at $5,000 in 1948 and in 1950, and at $9,000 in 1949. The taxpayers contend that their living expenses were not more than $2,000 in any of these years.

4. In the Tax Court, they contended the rate should have been twenty-five per cent.

In addition to the evidence and the analyses of bank statements which led to the Commissioner's determinations, the record discloses that the taxpayers and their two daughters until 1949 lived in an apartment, for which they paid a rental of $49.50 per month. In 1949, they moved into a new home, which the taxpayers had purchased for $14,500. Millikin belonged to a country club and to the Elks Club. During 1949 and 1950, the taxpayers employed a part time maid. During 1945 and 1946, the taxpayers owned one automobile, but in later years they owned two or more. Each of the daughters attended a college, one for a year or two and the other for a short period. Both of the daughters attended a business school in 1948 and 1949, where the cost of their room and board was $92 per month.

Upon all of this testimony, we think that the Tax Court's findings as to the amount of personal living expenses were entirely reasonable.

■ Finally, the taxpayers contest the assessment of fraud penalties and the conclusion that, because of fraud, these years were not barred by the Statute of Limitations.

Clearly, the finding that the taxpayers filed their returns with willful and fraudulent intent to evade tax was not foreclosed by Millikin's testimonial assertion that he had no such intention. Their returns disclose a consistent and substantial understatement of income. During the investigation of these returns by the agents, Millikin refused to give them access to some of his records, and those to which the agents did have access were insufficient to determine his taxable income. Since we find without basis the taxpayers' attacks upon the net worth computations as recomputed by the Tax Court, these circumstances fully justify the findings and conclusions of the Tax Court on the fraud issues. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150.

Affirmed.