Leon J. Toledano v. Commissioner. Leon J. Toledano and Esther C. Toledano v. Commissioner.
Toledano v. Commissioner
Docket Nos. 48694, 48695.
United States Tax Court
T.C. Memo 1963-200; 1963 Tax Ct. Memo LEXIS 144; 22 T.C.M. (CCH) 984; T.C.M. (RIA) 63200; July 29, 1963
*144 Held, a part of the deficiencies for each of the years 1944 through 1947 and a part of the deficiencies for each of the years 1949 and 1950 were due to fraud with intent to evade tax. Robert Weinstein, for the petitioners. Douglas M. Moore and Allen T. Akin, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: In these consolidated proceedings the respondent determined deficiencies in income tax and additions to the tax for the calendar years 1944 through 1950 in amounts as follows: Additions to the Tax Under Section
Docket
293(b)
294(d)(1)(A)
294(d)(2)
Year
Number
Deficiency
1939 I.R.C.
1939 I.R.C.
1939 I.R.C.
1944
48694 *
$39,000.65
$19,500.33
1945
48694 *
41,499.05
21,344.84
$2,626.59
1946
48694 *
21,285.22
11,487.97
1,388.58
1947
48694 *
5,945.53
2,972.77
$554.98
369.99
1948
48694 *
79.54
39.77
1949
48695 **
4,808.34
2,404.17
1950
48695 **
5,923.62
2,961.81
358.66
*145 (Note: Hereafter, wherever the word "petitioner" is used it also includes the word "petitioners" where appropriate and vice versa.) The respondent, by amendment to answer, claimed increased deficiencies in taxes and additions to the tax as follows: Additions to the Tax
Under Section
293(b)
294(d)(2)
Year
Deficiency
1939 Code
1939 Code
1945
$ 835.78
$ 417.89
$ 50.14
1946
6,373.19
3,186.59
382.40
Petitioners have assigned errors as follows: (1) For each of the calendar years 1944 through 1947, 1949, and 1950 the respondent erroneously determined petitioners' taxable income on the net worth basis rather than as disclosed by the income tax return; (2) For the calendar year 1948, although petitioner's return disclosed more income than determined by respondent on the net worth basis, the respondent erroneously determined that petitioner's income tax liability was $79.54 more than he disclosed on his return; (3) For each of the calendar years 1944 through 1950 the respondent erroneously determined that a part of the deficiency for each year *146 was due to fraud with intent to evade tax; (4) For each of the calendar years 1945, 1946, 1947, and 1950 the respondent erroneously determined additions to the tax under section 294(d)(2), I.R.C. of 1939; and (5) For the calendar year 1947 the respondent erroneously determined additions to the tax under section 294(d)(1)(A), I.R.C. of 1939. In his opening statement, counsel for respondent conceded error in determining an addition to the tax for fraud against petitioner for the calendar year 1948. On brief, respondent concedes that there is no addition to the tax, under the provisions of section 294(d)(1)(A) of the Internal Revenue Code of 1939, due from petitioner for the calendar year 1947. The parties are agreed that the deficiencies and additions to the tax for 1944 and 1945 are barred in the absence of fraud and that the assessment of the deficiencies and additions to the tax for all the other years were timely made. Petitioner, however, contends that collection is barred for all years, although there was no assignment of error to this effect. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioners are husband *147 and wife. Petitioner filed his individual original Federal income tax returns for the calendar years 1944 through 1946 with the then collector of internal revenue for the district of Mississippi at Jackson, Mississippi, in which he reported a net income and tax liability as follows: Year
Net Income
Tax Liability
1944
$11,641.45
$2,512.33
1945
9,183.39
1,675.52
1946
8,045.06
1,056.13
Petitioner filed his individual Federal income tax returns for the calendar years 1947 and 1948 with the then collector of internal revenue for the district of Louisiana at New Orleans, Louisiana, in which he reported a net income and tax liability as follows: Year
Net Income
Tax Liability
1947
$4,638.95
$221
1948
4,782.70
116
Petitioners filed joint income tax returns for the calendar years 1949 and 1950 with the then collector of internal revenue for the district of Louisiana in which they reported a net income and tax liability as follows: Year
Net Income
Tax Liability
1949
$6,075.94
$411.00
1950
6,209.34
454.02
Petitioner was born in Tiberias, Palestine, on February 4, 1900. Prior to his first entry into the United *148 States on May 10, 1939, he had lived in the following places and countries: Tiberias, Palestine
1900-1915
Corsica, France
1915-1919
France
1919-1921
Tiberias, Palestine
1921
Corsica, France
1921-1924
Tiberias, Palestine
1924-1925
Corsica, France
1925-1933
Tiberias, Palestine
1933-1936
Corsica, France
1936-1938
Tiberias, Palestine
1938-1939
Petitioner attended Fesh College at Ajaccio, Corsica, and speaks Hebrew fluently. He also speaks a little Italian and some Arabic, French, and English. Prior to his coming to the United States he had been in the wholesale dry goods business in Corsica, France, and owned rental properties in both Corsica and Palestine, which properties he continued to own through 1953. On May 10, 1939, petitioner arrived at the Port of New York, New York, with a French passport. He was admitted to the United States for a 6 months' stay which, at various times, was extended until July 2, 1942. However, in April 1942 he went to Montreal, P. Q. Canada, and reentered the United States on April 22, 1942, under an immigration visa issued to him on that date by the United States Consul at Montreal. Thereafter and during the taxable *149 years here involved he was a resident alien of the United States. Since October 24, 1924, and continuing throughout the period here involved petitioner has been married to Esther C. Toledano, also known as Ester Toledano. They have four children named and the year of their birth as follows: Beni
1925
Lilly (also Lilli)
1929
Jacques
1937
Janette
1938
Esther and her four children lived abroad in Corsica from 1939 until they sailed from Marseilles, France, for the Port of New Orleans, Louisiana, at which port they landed on March 10, 1947. Petitioner's original returns for 1944, 1945, and 1946 were prepared by the accounting firm of Dick D. Quin, Jackson, Mississippi, from information supplied by petitioner and without examination of any of his records, bank statements, or cancelled checks. Petitioner furnished in written from the items of income and deductions to be reported on his returns. Subsequently, in 1948, and prior to any investigation into petitioner's tax affairs by respondent, the accounting firm of Quin prepared amended returns on behalf of petitioner for the years 1945 and 1946, after an examination and audit of the books and records of a corporation *150 (Toledo Wholesale Company, Inc.) the organizers of which had employed petitioner from sometime in July 1945 to sometime in October 1946. These amended returns reported a net income and tax liability as follows: Year
Net Income
Tax Liability
1945
$12,597.69
$2,866.14
1946
13,661.61
2,746.84
Quin, a certified public accountant, personally went over the original returns for 1944, 1945, and 1946 with petitioner because petitioner was new in this country and Quin wanted to help him. Quin told petitioner that he wanted to know all of petitioner's income and all items that he was entitled to deduct. Petitioner's returns for 1947 and 1948 and the joint returns of petitioners for 1949 and 1950 were prepared by Richard G. Verlander, certified public accountant, from information supplied by petitioner and without examination of any of his records, bank statements, or cancelled checks. Petitioner furnished orally or in written form the items of income and deductions reported on these returns. Verlander reviewed the returns with petitioner as he did with any tax client and asked him if there were any other items of income or deductions that petitioner had not given *151 him. By letter dated March 27, 1941, petitioner advised the Immigration and Naturalization Service that he had changed his residence from 1038 Burdette Street, New Orleans, Louisiana, to 1914 W. Capitol Street, Jackson, Mississippi. During October 1946 petitioner moved back to New Orleans and resided at 3028 Prytania Street where he continued to live until November 2, 1951, when he left the United States as hereinafter stated. Beginning in 1941 and continuing until July 17, 1945, petitioner, doing business as Toledo Wholesale Company, operated a wholesale dry goods business in Jackson, Mississippi. In June 1945 petitioner negotiated with Frank A. Martin and associates to sell the business known as Toledo Wholesale Company to them. During the course of their negotiations petitioner represented to Martin that petitioner had realized a net profit of $36,000 from the operation of the wholesale business during 1944 and that during the period January 1, 1945, to June 1945 he had realized a net profit of $25,000 from the operation of the business. Pursuant thereto, petitioner presented for examination a set of books and records on the business for 1944 and 1945 and an accountant named *152 George Ray examined the same on behalf of Martin. The examination satisfied Martin that petitioner had in fact realized from the business during 1944 and 1945 the profits petitioner had represented. On his original returns for 1944 and 1945, however, petitioner reported a net income from the operation of Toledo Wholesale Company of $10,133.75 for 1944 and a net loss from the operation of the business of $3,162.56 for the period from January 1, 1945, to July 17, 1945, inclusive. He reported the same net loss in the amended return for 1945. By contract executed on July 17, 1945, petitioner sold the fixtures and inventory of Toledo Wholesale Company, his wholesale dry goods business, to Martin and associates for a consideration of $2,000 then paid. The contract also stated "but this payment [$2,000] is made subject to the other conditions hereinafter stipulated and constitutes only a portion of the purchase price of said business." Petitioner agreed to manage the business for the purchasers for a period of at least two months but not more than one year for a weekly salary of $100, plus a commission of 5 percent on the gross sales of the business, said commission to be paid monthly. *153 In consideration of the goodwill of the business and petitioner's business connections, the purchasers agreed to pay petitioner 3 1/2 percent of all gross sales of the business, payable quarterly, from the date petitioner left their employment to August 17, 1946. The purchasers, however, were given the option to limit to $5,000 the total sum to be paid petitioner for the goodwill of the business and his business connections provided they affirmatively exercised same while petitioner was still in their employment or during the first half of the period between the date petitioner left their employment and August 17, 1946. Petitioner personally retained all accounts receivable of the business on hand at the date of sale and agreed to save the purchasers harmless from any liability for accounts payable incurred by petitioner prior to July 17, 1945, other than those arising from merchandise already ordered but not yet received. It was further agreed that the purchasers could assign the contract to a corporation organized to operate the business and that the rights and duties created by the contract between petitioner on the the one hand and Martin and his associates on the other would equally *154 be binding between petitioner and the corporation so organized. After purchasing the business from petitioner, the purchasers incorporated the business as Toledo Wholesale Company, Inc. The corporate checking account was maintained at the Commercial Bank and Trust Company, Jackson, Mississippi. In August 1945 petitioner agreed to accept $5,000 in notes, payable $500 monthly, beginning October 1, 1945, in satisfaction of his rights to compensation for goodwill on the sale of the business. He also agreed to remain as manager of the business for a minimum of 90 days from July 17, 1945. The other terms of the contract of July 17, 1945, remained unchanged. On November 21, 1945, petitioner agreed to remain as manager of the business through January 31, 1946 and to assist on a buying trip to New York City in February 1946, in consideration for which the corporation agreed to pay petitioner a commission of 10 percent instead of 5 percent on the gross sales of the business for December 1945 and January 1946, and a bonus of $1,000 in addition to his weekly salary of $100. It also was agreed that petitioner could cash the balance of his notes for goodwill before January 31, 1946, provided *155 the corporation had sufficient funds on hand for said purpose in addition to paying their current bills for merchandise received. The other terms of the contract of July 17, 1945, remained unchanged. On February 1, 1946, petitioner's employment contract was again extended to April 1, 1946, at the salary of $100 per week plus commission of 10 percent on the gross sales of the business. On May 1, 1946, petitioner entered into a new employment contract with Toledo Wholesale Company, Inc., for a period of 5 months superseding all prior agreements. Petitioner agreed to buy merchandise for the business and to make bi-monthly trips to New York City for that purpose. He also agreed to manage and direct the sales and business of the corporation, including the hiring of help, supervision of bookkeeping, filling of orders, and the correspondence of the business. The corporation agreed that petitioner was to travel at the expense of the corporation and was to receive a commission of 5 percent on the total buying of the corporation and, in addition thereto, 3 1/2 percent of the total sales made by the company. Should, however, the average monthly sales of the corporation exceed $30,000, petitioner *156 was to receive only 6 percent of the total gross sales and no commission on the buying. Petitioner was to receive a weekly withdrawal of $250 and the balance at the end of each month. On May 6, 1946, the May 1, 1946, contract was amended to pay petitioner $200 extra per month for supervising and taking care of the bookkeeping and correspondence providing the total monthly sales did not average over $35,000 per month. In October 1946 the corporation agreed to pay petitioner a commission of 3 percent on merchandise purchased through regular connections and 5 percent where bargaining was necessary to arrive at the purchase price. The agreement was to run until January 1, 1947. During the years 1945 and 1946 petitioner received checks from Toledo Wholesale Company, Inc., as payments for the following items: Item
1945
1946
Salary
$ 2,400.00
$ 1,300.00
Commissions
11,486.23
22,474.69
Bonus
$ 1,000.00
Part payment for goodwill
$ 500.00
3,000.00
Totals
$14,386.23
$27,774.69
On his original and amended returns for 1945 petitioner reported income from salaries and commissions of $8,050 and $7,674.21, respectively. He computed the latter amount as *157 follows: Salary
$ 2,400.00
Commission
8,274.21
$10,674.21
Deduct: Traveling expenses, help, etc.
3,000.00
$ 7,674.21
On his original and amended returns for 1946 petitioner reported income from salaries and commissions of $6,955 (commissions $10,240, less traveling expenses, help, etc., $3,285) and $12,571.55, respectively. He computed the latter amount as follows: Salary
$ 2,300.00
Commission
13,556.55
$15,856.55
Deduct: Traveling expenses, help, etc.
3,285.00
$12,571.55
Between May 11, 1939, and January 3, 1950, petitioner opened and, in some cases, closed and reopened, checking, savings and investment accounts in at least 23 different banks located in New York City, Jackson, Mississippi, and New Orleans, Louisiana. He also had postal savings accounts both in New York City and New Orleans. As of the close of each of the years 1943 through 1950 petitioner did not have any appreciable amount of undeposited cash on hand. On February 1, 1945, petitioner opened a brokerage account with Merrill Lynch, Pierce, Fenner, and Beane, sometimes hereinafter called Merrill Lynch, through which he bought and sold stocks and bonds during *158 the years 1945 through 1950. Petitioner was furnished monthly statements of his account with Merrill Lynch for each of the years 1945 through 1950 which reflected the funds deposited into the account, stocks and bonds elsewhere purchased transferred to the account, purchases and sales of stocks and bonds on behalf of petitioner, dividends and interest received for petitioner on stocks and bonds held by the broker for his account, interest paid by the broker on petitioner's cash balance in his investment account, petitioner's cash balance with said account, and an inventory of the stock-and bonds so held on his behalf Merrill Lynch purchased for the account of petitioner the following corporate stocks at acquisition costs, including brokerage, as follows: No. of
Date
Stock
Shares
Cost
Feb. 5, 1945
General Motors
10
$ 647.56
Feb. 5, 1945
Sears Roebuck
10
1,052.15
Feb. 5, 1945
J. C. Penney
10
1,094.35
Mar. 2, 1945
General Electric
20
848.70
Mar. 2, 1945
General American
Transportation
20
1,078.04
Oct. 16, 1945
Lerner Stores
20
516.20
Oct. 16, 1945
Standard Oil of
N.J.
20
1,328.61
Oct. 16, 1945
Reynolds Tobacco
Co.
20
790.12
Oct. 16, 1945
Safeway Stores
20
500.06
Nov. 28, 29, 1945
Commercial Cred-
it
15
697.00
Nov. 28, 29, 1945
Reynolds Tobacco
15
575.12
Nov. 28, 29, 1945
U.S. Steel
10
795.60
Nov. 28, 29, 1945
Anaconda Copper
15
689.86
Nov. 28, 29, 1945
International Nick-
el
15
579.65
Nov. 28, 29, 1945
Manufacturers
Trust
10
622.50
Nov. 28, 29, 1945
Chase National
Bank
15
689.38
Nov. 28, 29, 1945
Paramount Pic-
tures
10
458.81
Nov. 28, 29, 1945
American Tobacco
10
901.43
Feb. 17, 1947
American Tele-
phone & Tele-
graph
5
869.68
Feb. 17, 1947
General Motors
5
329.44
Feb. 17, 1947
Bethlehem
5
493.43
Oct. 6, 1949
Southern Com-
pany
100
975.00
*159 On May 25, 1945, petitioner opened an account with Shaskan & Co., 40 Exchange Place, New York 5, New York. On May 29, 1945, Shaskan & Co. purchased the following corporate stocks for petitioner at acquisition costs, including brokerage, as follows: Acquisition
No. of
Cost includ-
Stock
Shares
ing Brokerage
Allied Stores
25
$ 709.63
American Tobacco Co.
10
771.43
Chesapeake & Ohio R.R.
20
1,067.96
North American Company
25
608.31
Proctor & Gamble
20
1,229.26
Standard Oil of Calif.
10
431.85
On October 16 and 17, 1945, Shaskan & Co. purchased for the account of petitioner the following corporate stocks at acquisition costs, including brokerage, as follows: Acquisition
No. of
Cost includ-
Stock
Shares
ing Brokerage
Lerner Stores
30
$ 787.50
American Telephone &
Telegraph
10
1,843.10
General Electric
20
976.20
Pittsburgh Plate Glass
10
1,512.50
Reynolds Tobacco Co.
20
797.62
Safeway Stores
20
505.06
Standard Oil of New Jer-
sey
20
1,333.62
During 1942 and through June 16, 1947, petitioner purchased $53,925 par value of United States Savings and Treasury bonds, $34,700 of which he *160 still held on December 31, 1950. During the years 1945 through 1950, dividends were either credited or paid to petitioner and reported by him in his original returns in amounts as follows: Paid or
Year
Credited
Reported
1945
$ 356.60
$ 22.50
1946
1,001.37
123.10
1947
1,130.75
697.50
1948
819.64
670.30
1949
781.34
837.50
1950
987.00
897.50
During the years 1944 through 1950 interest was either credited or paid to petitioner and reported by petitioner in his original returns in amounts as follows: Paid or
Year
Credited
Reported
1944
$ 96.67
$0
1945
928.18
340.24
1946
1,586.65
392.50
1947
1,845.68
1,097.00
1948
1,822.34
597.50
1949
1,767.63
375.00
1950
1,845.74
639.50
During the years 1940 through 1948 petitioner purchased real estate which he still owned on December 31, 1950, as follows: Date
Purchased
Description
Cost
Oct. 8, 1940
3028 Prytania St., New Orleans, La.
$13,520.00
Feb. 7, 1941
1914 W. Capitol St., Jackson, Miss.
14,750.00
Aug. 5, 1946
230 Chartres St., New Orleans, La.
14,901.00
Feb. 14, 1947
216-18 Chartres St., New Orleans, La.
29,500.00
Feb. 16, 1948
2512-14 Tulane Ave., New Orleans, La.
11,089.50
Apr. 16, 1948
3112 Tulane Ave., New Orleans, La.
25,571.00
June 10, 1948
1916 W. Capitol St., Jackson, Miss.
$ 12,500.00
May 25, 1948
3600-08 Eagle St., New Orleans, La.
31,083.50
Total
$152,915.00
*161 During the taxable years 1947 to 1950, inclusive, petitioner made the following expenditures for improvements made under his direct supervision to the following properties: 216
3028
2512
Year
Chartres St.
Prytania St.
Tulane Ave.
Total
1947
$309.73
$ 140.10
$0
$ 449.83
1948
287.02
3,223.95
11,335.36
14,846.33
1949
0
0
3,520.69
3,520.69
1950
316.20
0
0
316.20
$912.95
$3,364.05
$14,856.05
$19,133.05
On or about January 18, 1953, petitioner's equity in the above real estate was appraised at $116,216.82 over and above the amount of the deficiencies, additions to the tax and interest which had been assessed as hereinafter stated. In October 1946 when petitioner moved back to New Orleans he opened a dry goods business in New Orleans under the name of Toledo Wholesale Company, which name he had previously used in Jackson, Mississippi. At the close of business on December 31, 1943, through 1950 petitioner had inventories of merchandise on hand as follows: Year Ended
December 31
Inventory
1943
$12,716.58
1944
9,778.47
1945
None
1946
16,975.65
1947
7,356.85
1948
3,000.00
1949
6,544.00
1950
32,437.27
*162 Throughout the period 1939 through 1950 petitioner maintained an account in Palestine with the Hadar Hacarmel branch of Barclays Bank (Dominion, Colonial and Overseas), incorporated in the United Kingdom with limited liability. As of the close of each of the years 1939 through 1950 petitioner had balances on deposit in said branch as follows: December 31
Amount
1939
$ 90.66
1940
9,394.92
1941
422.46
1942
233.80
1943
1,419.68
1944
689.60
1945
9,442.22
1946
2,011.53
1947
$1,396.24
1948
2,895.76
1949
4,801.40
1950
9,146.20
During the period April 6, 1941, through January 30, 1948, petitioner transferred funds into the United States from his account at the Hadar Hacarmel branch in total amounts as follows: Total
Period
Transferred
1941
$11,598.65
1942
5,486.07
1943
4,548.25
1944
5,880.53
1945
1,771.00
1946
13,886.25
1947
4,631.63
1948
1,711.69
During the period October 27, 1944, through February 2, 1948, petitioner maintained an account in Palestine with Jerusalem Allenby Square branch of Barclays Bank. On or about February 2, 1948, his account at the Allenby Square branch was transferred to the Jerusalem *163 Western branch of that bank. Petitioner continued to maintain credit balances in said account until May 23, 1951. As of the close of each of the years 1941 through 1950 petitioner had balances on deposit in said branches as follows: December 31
Amount
1941
$ 301.86
1942
4,584.56
1943
9,718.51
1944
9,716.49
1945
10,919.97
1946
13,330.94
1947
420.97
1948
418.95
1949
288.34
1950
285.34
On or about May 16, 1947, Toledo Wholesale Company, Inc., filed in the Chancery Court of Lauderdale County, Mississippi, an amended bill of complaint against petitioner, alleging that after petitioner entered the employment of complainant he withdrew large sums of money from the bank account of your complainant amounting in the aggregate to $88,469.50 and prayed for an accounting from the defendant of the above-mentioned funds. On or about January 15, 1948, petitioner filed in the District Court of the United States for the Southern District of Mississippi a complaint against Toledo Wholesale Company, Inc., alleging that the defendant owes plaintiff the amount of $7,215.54 for which plaintiff demands judgment against defendant. On or about September 24, 1948, a *164 settlement was reached by the parties to both the above-mentioned suits. As a result of the suit brought by Toledo Wholesale Company, Inc., petitioner engaged the services of Quin to examine the books of the complainant. As a result of this examination, Quin found that petitioner had received more income from Toledo Wholesale Company, Inc., during the time petitioner was employed by that company in 1945 and 1946, and suggested that petitioner file the previously mentioned amended returns for those years, which petitioner did on or about December 9, 1948. On February 12, 1951, petitioner departed from the United States for France and Israel (formerly Palestine) returning to the United States on May 28, 1951. Meanwhile on March 16, 1951, petitioner's case had been assigned to a special agent, Esparros. Esparros first personally contacted petitioner concerning the instant income tax investigation on June 22, 1951, and on June 25, 1951, together with revenue agent Newton Fisk, began to examine some of petitioner's records. When Esparros and Fisk returned to petitioner's place of business on June 26, 1951, petitioner requested that they go with him to see his attorney, Fred Kullman. *165 Kullman then requested that the agents suspend their examination for the time being for the reason that he would like to have an audit run on petitioner's books. On October 30, 1951, petitioner withdrew his balance of $7,784.55 from his savings account at the Bowery Savings Bank, and November 2, 1951, left the United States, sailing from New York on the S. S. Liberte bound for LeHavre, France. For a time after his departure from the United States on November 2, 1951, petitioner was in his native Palestine (now Israel) visiting Tiberias and Haifa. Presently, however, he is residing in Mexico City. He has remained without the United States continuously since November 2, 1951. On November 15, 1951, Robert Weinstein (present counsel for petitioner) and Kullman appeared at a conference with Esparros at which time they advised Esparros that petitioner had left the country. This was the first information Esparros had received that petitioner had left the country. On January 8, 1953, respondent made jeopardy assessments against petitioner for the taxable years 1944 to 1948, inclusive, and against petitioners jointly for the taxable years 1949 and 1950, and on February 25, 1953, mailed *166 statutory notice conforming to the jeopardy assessments to petitioner as to the taxable years 1944 to 1948, inclusive, and to petitioners jointly as to the taxable years 1949 and 1950, to 3028 Prytania Street, New Orleans, Louisiana, in which the respondent determined the previously mentioned deficiencies in income tax liabilities for the years 1944 through 1950, computed by the net worth-expenditures method. A brief summary of this net worth statement is as follows: Increase
Add
Less
Net Worth
in Net
Nondeduct-
Capital Gains
Year
(Total Assets
Worth Over
ible
and
Net
Ending
less Total
Previous
Personal
Standard
Income
Dec. 31
Liabilities)
Year
Expenditures
Deduction
Determined
1943
$152,054.11
1944
215,028.12
$62,974.01
$ 4,683.99
$ 500.00
$ 67,158.00
1945
282,830.05
67,801.93
6,675.80
2,885.51
71,592.22
1946
324,686.13
41,856.08
6,528.52
48,384.60
1947
339,231.96
14,545.83
7,503.38
500.00
21,549.21
1948
333,980.13
(5,251.83)
10,560.72
530.89
4,778.00
1949
352,624.97
18,644.84
7,788.09
1,000.00
25,432.93
1950
374,279.37
21,654.40
7,512.00
1,000.00
28,166.40
On January 13, 1953, levies *167 were made on petitioner's savings and loan accounts at the Union Savings, Central Savings, Equitable-Mutual, Security Building and Loan, Guaranty Savings of New Orleans, and against his investment account with Merrill Lynch. Liens were also filed on petitioner's real estate both at New Orleans, Louisiana, and Jackson, Mississippi. By letter dated January 28, 1953, Beni B. Toledano, acting on behalf of his father, requested that the levies served on the banks, homesteads and Merrill Lynch be released. Pursuant to that request, the levies on personal property were released on January 29, 1953. On April 1, 1953, Esparros released his special agent's report on petitioner. Thereafter, on July 27, 1953, petitioner simultaneously commenced to liquidate both his investment accounts at six of the banks and the United States savings bonds held in safekeeping for him at the Federal Reserve Bank of New York. Respondent retained more than an adequate amount of security by holding its lien on petitioner's real estate. Ultimate Findings of Fact Petitioner's total assets as of December 31, 1943, through 1950 consisted of the following: Kind of Assets
12/31/43
12/31/44
12/31/45
12/31/46
Assets in the United States: Cash in banks - checking
$ 31,637.22
$ 59,836.43
$ 38,338.84
$ 53,612.30
accounts
Cash in banks - savings
0
20,025.00
52,227.19
53,702.08
accounts
Building & Loan Associations
0
5,000.00
15,066.72
15,706.67
U.S. Postal Savings Accounts
0
0
2,500.00
2,500.00
Cash balance with Merrill
0
0
403.56
1,259.68
Lynch
Cash deposit on 216-18
0
0
0
8,000.00
Chartres St.
United States Savings Bonds
168.75
618.75
693.75
693.75
United States Treasury Bonds
0
6,000.00
26,000.00
26,000.00
Corporate Stocks and
0
0
26,439.18
26,834.43
Debentures
Inventories
12,716.58
9,778.47
0
16,975.65
Automobiles
1,500.00
1,500.00
0
0
Furniture and Fixtures
4,000.00
4,000.00
2,100.00
3,100.00
Real Estate - New Orleans,
13,520.00
13,520.00
13,520.00
28,421.00
La.
Real Estate - Jackson, Miss.
14,750.00
14,750.00
14,750.00
14,750.00
Assets in Foreign Countries: On deposit in banks
11,138.19
10,406.09
20,362.19
15,342.47
Real Estate
85,000.00
85,000.00
85,000.00
85,000.00
Total Assets
$174,430.74
$230,434.74
$297,401.43
$351,898.03
*168 Kind of Assets
12/31/47
12/31/48
12/31/49
12/31/50
Assets in the United States: Cash in banks - checking
$ 19,546.21
$ 631.74
$ 6,925.26
$ 10,619.79
accounts
Cash in banks - savings
58,816.49
16,527.45
18,696.93
12,952.12
accounts
Building & Loan Associations
25,324.84
32,637.50
34,120.68
32,881.23
U.S. Postal Savings Accounts
2,500.00
0
2,500.00
2,500.00
Cash balance with Merrill
975.89
10.00
298.00
0
Lynch
Cash deposit on 216-18
0
0
0
0
Chartres St.
United States Savings Bonds
26,893.75
26,200.00
26,200.00
26,200.00
United States Treasury Bonds
26,000.00
8,500.00
8,500.00
8,500.00
Corporate Stocks and
29,137.32
11,956.86
12,909.23
12,909.23
Debentures
Inventories
7,356.85
3,000.00
6,544.00
32,437.27
Automobiles
2,680.68
2,680.68
2,680.68
2,680.68
Furniture and Fixtures
3,100.00
5,100.00
9,400.00
10,383.94
Real Estate - New Orleans,
58,370.83
140,961.16
144,481.85
144,798.05
La.
Real Estate - Jackson, Miss.
14,750.00
27,250.00
27,250.00
27,250.00
Assets in Foreign Countries: On deposit in banks
1,817.21
3,314.71
5,089.74
9,431.54
Real Estate
85,000.00
85,000.00
85,000.00
85,000.00
Total Assets
$362,270.07
$363,770.10
$390,596.37
$418,543.85
*169 Petitioner's total liabilities as of December 31, 1943, through 1950 consisted of the following: Kind of Liabilities
12/31/43
12/31/44
12/31/45
12/31/46
Mortgages Payable
$ 15,446.21
$ 4,575.00
0
0
Reserves for Depreciation
5,824.86
9,739.26
$ 12,447.21
$ 16,058.29
Total Liabilities
$ 21,271.07
$ 14,314.26
$ 12,447.21
$ 16,058.29
Kind of Liabilities
12/31/47
12/31/48
12/31/49
12/31/50
Mortgages Payable
0
0
0
0
Reserves for Depreciation
$ 20,671.39
$ 26,841.13
$ 34,849.95
$ 43,070.64
Total Liabilities
$ 20,671.39
$ 26,841.13
$ 34,849.95
$ 43,070.64
Petitioner's net worth (i.e., total assets less total liabilities), increase in net worth over the previous year, nondeductible personal expenditures, capital gains and standard deductions, and the correct net income, computed by the net worth-expenditures method, for the calendar years 1943 through 1950, are as follows: Less
Capital
Net Worth
Increase in
Gains and
(Total
Assets Less
Net Worth
Add Nondeduc-
Standard
Year
Total Lia-
Over Previ-
tible Personal
Deduc-
Correct Net
Ending
Dec. 31
bilities)
ous Year
Expenditures
tions
Income
1943
$153,159.67
1944
216,120.48
$62,960.81
$ 4,683.99
$ 500.00
$ 67,144.80
1945
284,954.22
68,833.74
6,675.80
2,885.51
72,624.03
1946
335,839.74
50,885.52
6,528.52
57,414.04
1947
341,598.68
5,758.94
7,503.38
500.00
12,762.32
1948
336,928.97
(4,669.71)
10,560.72
530.89
5,360.12
1949
355,746.42
18,817.45
7,788.09
1,000.00
25,605.54
1950
375,473.21
19,726.79
7,512.00
1,000.00
26,238.79
Total
$267,149.64
*170 The difference between the above correct net income and the net income originally reported and heretofore stated is as follows: 1944
$55,503.35
1945
63,440.64
1946
49,368.98
1947
8,123.37
1948
577.42
1949
19,529.60
1950
20,029.45
A part of the deficiencies for each of the years 1944, 1945, 1946, 1947, 1949, and 1950 was due to fraud with intent to evade tax. For these years petitioner filed false and fraudulent returns with intent to evade tax. The deficiencies determined by the respondent for the years 1944 through 1950 are not barred by the statute of limitations. Opinion The principal question in these consolidated cases is whether, under section 293(b) of the 1939 Code, [1] "any part of any deficiency is due to fraud with intent to evade tax" in regard to the calendar years 1944 through 1947, and the calendar years 1949 and 1950. The respondent also determined fraud for 1948 but now concedes there was no fraud for that year. *171 For each of the years (except 1948) the respondent determined that petitioner had unreported net income computed by means of the net worth-expenditures method, all of which was contested by petitioner. At the trial, which lasted three full days, the respondent established the amount of petitioner's net income for each of the years 1944 through 1950, inclusive, by the net worth-expenditures method, and such variation as appears from the net worth as originally determined is set forth in the following table: Net Income Origi-
Net Income Re-
Increase or
Year
nal Statement
vised Statement
(Decrease)
1944
$ 67,158.00
$ 67,144.80
$ (13.20)
1945
71,592.00
72,624.03
1,031.81
1946
48,384.60
57,414.04
9,029.44
1947
21,549.21
12,762.32
(8,786.89)
1948
4,778.00
5,360.12
582.12
1949
25,432.93
25,605.54
172.61
1950
28,166.40
26,238.79
(1,927.61)
$267,061.36
$267,149.64
$ 88.28
In comparing the two statements, the original and the revised, it is noted that the over-all change is only $88.28 more net income in the revised statement than in the original statement, but on a separate year basis the revised statement shows considerably *172 more income for 1945 and 1946 and considerably less income for 1947 and 1950. For the years 1945 and 1946 the respondent, by amendment to answer, has made claim under section 272(e) [2] of the 1939 Code for increased deficiencies and increased additions to the tax. In our findings we have shown the net income reported by petitioner for each of the years here involved. We have also shown the correct net income for each of the years. A comparison of the latter with the former shows that for the years 1944 through 1950 (except the year 1948 for which year the respondent concedes there was no fraud) petitioner consistently understated his income for each year by substantial amounts ranging from *173 a low of over 150 percent to a high of almost 700 percent. No explanation whatever has been given for these large understatements of income. Petitioner did not appear at the hearing and no evidence other than the stipulated facts which went to prove the greater part of the net worth statements and the cross-examination of respondent's witnesses was offered on his behalf. Petitioner has been outside of the United States continuously since November 2, 1951, and no explanation was given as to why he could not appear at the hearing or why his deposition could not have been taken. His adult son, Beni B. Toledano, who lives in New Orleans, and whom petitioner appointed his "true and lawful attorney in fact, general and special" on September 20, 1951, did not testify at the hearing held in New Orleans. It would seem that if this large discrepancy in income between what was reported and what is shown by the net worth method could be satisfactorily explained, either petitioner or his son should have attempted to do so. As the Supreme Court said in the case, often cited, of Holland v. United States, 348 U.S. 121, "Once the Government has established its case, the defendant remains *174 quiet at his peril." Petitioner had several sources of income, namely, his dry goods business up to July 17, 1945, his income from salary and commissions while employed by Toledo Wholesale Company, Inc., from July 17, 1945, to October 1946, his individual dry goods business in New Orleans from October 1946 through 1950, income from interest, dividends, rent and dealings in stocks and bonds. There was no evidence of any nontaxable income received or of any property acquired by way of gift or inheritance. The books and records kept by petitioner were not offered in evidence. Quin and Verlander, the certified public accountants who prepared petitioner's returns, prepared them from statements given to them by petitioner and not from the books and records themselves. The accountants accepted what petitioner gave them and never made an audit of the books. The respondent was unable to determine petitioner's true income from his books and was forced to resort to the net worth-disbursements method of determining his income. The resort to this method was proper. Holland v. United States, supra; Hargis v. Godwin, 221 F. 2d 486, 491 (C.A. 8, 1955). This method demonstrated *175 that petitioner's net worth increased substantially year after year and the increase each year was much larger than the net income being reported by petitioner. In fact, in 1945, as previously pointed out herein, the increase in net worth over the previous year was almost seven times the amount of net income reported by petitioner for that year. Petitioner manifestly was a shrewd and astute business man. Within two days after entering this country he had opened four bank accounts and between May 11, 1939, and January 3, 1950, he had opened, and in some cases, closed and reopened accounts in at least 23 different banks. He personally supervised the improvements made to his real estate. He was exceptionally active in business affairs. In order to prove fraud by clear and convincing evidence the respondent does not have to prove that all of the deficiency for each year is due to fraud. All the statute requires for each year is that "If any part of any deficiency is due to fraud with intent to evade tax" then the 50 percent addition should apply. And it is well to bear in mind that this 50 percent addition for civil fraud is not a penalty but, as the Supreme Court said in Helvering v. Mitchell, 303 U.S. 391: *176 The remedial character of sanctions imposing additions to a tax has been made clear by this Court in passing upon similar legislation. They are provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. * * * We think the respondent has met his burden by clear and convincing evidence that a part of each of the deficiencies here determined (except for the year 1948 for which year the respondent has conceded there was no fraud) was due to fraud with intent to evade tax. He has shown that there was paid or credited to petitioner for each year much larger amounts of interest than were reported by petitioner. Also, he has shown that for the years 1945, 1946, and 1947 there was paid or credited to petitioner for each of those years much larger amounts of dividends than were reported by petitioner. When petitioner was negotiating with the organizers of the Toledo Wholesale Company, Inc., to sell his sole proprietorship business called Toledo Wholesale Company, petitioner represented to them that he had made a net profit from the operation of that business of *177 $36,000 in 1944 and $25,000 from January 1, 1945, to June 1945 when, as a matter of fact, he reported on his 1944 return a net profit from that business of $10,133.75 and on his 1945 return a net loss from that business of $3,162.56. All of these discrepancies remain unexplained. When these specific items of omission from petitioner's returns for each of the years here involved are considered along with the understatements as demonstrated by the revised net worth-disbursements statement, we think it is quite evident that respondent has sustained his burden of proving fraud. The respondent has proven either by stipulation or otherwise each item going to make up the revised statement. We are satisfied that the entire statement, including the beginning net worth figure of $153,159.67 as of December 31, 1943, is substantially accurate and correctly reflects petitioner's net worth as of the close of each of the years included therein. It is true that the statement does not show any undeposited cash on hand but it is also true that the record does not show that at any time petitioner had any appreciable amount of undeposited cash. His activities at the many banks would indicate that any *178 actual undeposited cash would be too diminutive to be of any consequence. See Merritt v. Commissioner, 301 F. 2d 484, 486 (C.A. 5, 1962), affirming a Memorandum Opinion of this Court, and Rice v. Commissioner, 295 F. 2d 239 (C.A. 5, 1961) affirming per curiam a Memorandum Opinion of this Court. Although the proof of a likely source of unreported income is not necessary in every case, United States v. Massei, 355 U.S. 595, the respondent has, in our opinion, proven the actual source of a sufficient amount of unreported income to justify the finding that a part of the deficiency for each of the years here in question (except 1948) was due to fraud with intent to evade tax. The repeated and systematic failure to report substantial amounts of income over several consecutive years, as shown here by the revised net worth statement, is strong and adequate evidence of fraud. [3]
*179 We hold, therefore, that the respondent has sustained his burden as to the fraud issue for all years (except 1948). Regarding petitioner's assignments of error to the effect that the deficiencies determined by the respondent are in error, including respondent's refusal to consider the community property system in Louisiana, it is sufficient to say that the burden of proof was upon petitioner as to this phase of the case and that in no respect has he met this burden. Not only did petitioner not appear at the hearing but no witnesses were called in petitioner's behalf to show such error. The facts stipulated by petitioner and respondent went to the proof of the net worth statement. Of course, as far as the increased deficiencies and increased additions are concerned the burden of proof was upon respondent. We think the respondent has met his burden by proof of the additional net income as shown in the revised net worth-disbursements statement. To the extent that this statement shows less taxable income in any one year than originally determined by the respondent, petitioner is to have the benefit of such reductions. The deficiencies will therefore be redetermined in accordance with *180 the revised net worth-disbursements statement, and the increased deficiencies allowed to the extent asked for by the respondent. For the years 1945, 1946, 1947, and 1950, respondent determined certain additions to tax under section 294(d)(2) of the 1939 Code. No evidence whatsoever was introduced by petitioner in this respect and the respondent's determination that such additions are to be made is approved except to the extent of any modification automatically necessary by reason of the effect of the revised net worth statement. Finally, petitioner contends that the statute of limitations as to assessment and collection has run as to the years 1944 and 1945 and that the statute as to collection has run as to the years 1946 through 1950. Regarding the contention that the statute as to collection has run, it is sufficient to note that this matter was not pleaded and for that reason petitioner's contention should be denied. Eleanor C. Shomaker, 38 T.C. 192, 201; Given v. Commissioner, 238 F. 2d 579 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court. However, as we have found that the returns for 1944, 1945, 1946, 1947, 1949 and 1950 were "false *181 or fraudulent * * * with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time." Section 6501(c), Internal Revenue Code of 1954. Decisions will be entered under Rule 50. Footnotes
*. Petitioner Leon J. Toledano. ↩
**. Petitioners Leon J. and Esther C. Toledano.↩
1. SEC. 293. ADDITIONS TO THE TAX IN CASES OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
2. SEC. 272. PROCEDURE IN GENERAL. (e) Increase of Deficiency After Notice Mailed. - The Board shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any penalty, additional amount or addition to the tax should be assessed - if claim therefor is asserted by the Commissioner at or before the hearing or a rehearing.↩
3. See Holland v. United States, supra; Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845; William G. Lias, 24 T.C. 280, 309, 319, affd. 235 F. 2d 879 (C.A. 4, 1956), certiorari denied 353 U.S. 935; Meyer J. Safra, 30 T.C. 1026, 1036; J. K. Vise, 31 T.C. 220, affd. 278 F. 2d 642 (C.A. 6, 1960); Bryan v. Commissioner 209 F. 2d 822 (C.A. 5, 1954), certiorari denied 348 U.S. 912, affirming a Memorandum Opinion of this Court; Kite v. Commissioner, 217 F. 2d 585 (C.A. 5, 1955), affirming a Memorandum Opinion of this Court; Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court; Millikin v. Commissioner, 298 F. 2d 830↩ (C.A. 4, 1962), affirming a Memorandum Opinion of this Court.