HAROLD H. KLINGLER, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JANET V. KLINGLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Klingler v. Commissioner
Docket Nos. 5577-83, 9021-83.
United States Tax Court
T.C. Memo 1987-46; 1987 Tax Ct. Memo LEXIS 46; 52 T.C.M. (CCH) 1475; T.C.M. (RIA) 87046; January 21, 1987. *46 Harold H. Klingler, Jr., pro se. Charlotte D. Sennot, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: In these consolidated cases brought by petitioner Harold H. Klingler, Jr. (docket No. 5577-83) and by petitioner Janet V. Klingler (docket No. 9021-83), respondent determined the following Federal income tax deficiencies and additions to tax: *47 Docket No. 5577-83
Addition to Tax
Sec. 6653(b),
Sec. 6654,
Year
Deficiency
I.R.C. 1954
I.R.C. 1954
1973
$4,723
$2,362
$147
1974
$  933
$ 467
$ 19
1975
$1,629
$ 815
$ 81
1976
$4,887
$2,444
$138
Docket No. 9021-83
Addition to Tax
Sec. 6653(b),
Sec. 6654,
Year
Deficiency
I.R.C. 1954
I.R.C. 1954
1973
$3,859
$1,930
$118
1974
$  754
$ 377
$ 12
1975
$1,846
$ 923
$ 77
1976
$5,180
$2,590
$150
*48 The issues presented for decision are as follows: 1. Whether respondent's determination of petitioners' income by use of the bank deposits method of reconstruction, as modified by the stipulation of facts and supplemented by specific items of income, was erroneous. 2. Whether petitioner Harold H. Klingler, Jr., is liable for the self-employment tax imposed by section 1401(a)[1] with respect to his income from the operation of two motels in 1973 and 1974. 3. Whether any part of the underpayment of petitioners' tax for 1973 through 1976 was due to fraud within the meaning of section 6653(b). 4. Whether petitioners underpaid their estimated tax for 1973 through 1976 with the result that they are liable for the addition to tax imposed by section 6654. 5. Alternatively, if the section 6653(b) addition to tax for fraud is not applicable, whether petitioners are liable for the additions to tax for failure to file a return under section 6651(a)(1) and for negligence or intentional disregard of the revenue laws under section 6653(a). FINDINGS OF FACT At the time *49 the petitions in these consolidated cases were filed, petitioners Harold H. Klingler, Jr., and Janet V. Klingler, husband and wife, were residents of Montgomery, Alabama. During 1973, 1974, 1975, and 1976, they were husband and wife and were residents of Paso Robles and San Luis Obispo, California. Neither of them filed Federal income tax returns for those years and, in fact, Mr. Klingler has not filed a return since 1967. Mr. Klingler was graduated from the United States Military Academy at West Point, where he majored in mathematics, in 1965 and served in the U.S. Army for 5 years, including one year of combat service in Viet Nam. Mrs. Klingler is a graduate of the University of California at Santa Barbara where she received a Bachelor of Arts Degree in 1969 and a Master of Arts Degree in 1973. 1. Mrs. Klingler's Wages
During 1973 through 1976, Mrs. Klingler earned wages while employed as a school teacher and had the following indicated amounts withheld from her salary for the payment of Federal income taxes: 1973
1974
1975
1976
Total Wages
$2,590.00
$5,535.22
$315.50
$3,189.98
Withheld Tax
$ 280.00
$ 623.10
$ 6.66
2. Motel *50 Operations
Petitioners purchased the Stardust Motel (sometimes Stardust) in 1971, the Farmhouse Motel (Farmhouse) in 1972, and a house at 2230 Spring Street (the rental house) in 1972. Petitioners lived in the Farmhouse Motel until its sale in 1975 and then in the Stardust Motel from April 16, 1975 until its sale in October 1976. Petitioners operated both motels tegether; Mrs. Klingler cleaned rooms, checked in customers, and accepted money from customers. The revenue and special agents who investigated petitioners' income tax liabilities for 1973 through 1976 had no records with which to work. Petitioners kept no books and records on their income from the motels. They used registration cards to check in their guests but threw the cards in the trash after the guests checked out. Petitioners had bank accounts in the name of "Stardust Motel" at the Bank of America and at the Security Pacific National Bank. The agents determined petitioners' income by use of the bank deposits method of income reconstruction. Mr. Klingler refused to cooperate with the agents in their efforts to determine petitioners' income and sent letters to the banking institutions instructing them not to *51 comply with the Internal Revenue Service (hereinafter IRS) administrative summons. Enforcement proceedings were instituted and the institutions were directed by the United States District Court to turn over the requested records. In compliance with the court order, the Bank of America provided signature cards, bank statements for 1973 through 1976, and deposit slips for 1974 through 1976, and allowed the agents to microfilm records of items deposited into the petitioners' accounts. The Security Pacific National Bank provided signature cards, bank statements, and deposit slips; the deposits to the account consisted mainly of Master Charge receipts. Schedules prepared by the agents show the individual deposits made to each of these accounts. The total deposits to the Bank of America account were as follows: 1973
1974
1975
1976
$62,547.42
$47,644.74
$40,297.00
$15,997.37
The total deposits to the Security Pacific National Bank account were as follows: 1973
1974
1975
1976
$2,116.57
$3,640.49
$2,505.80
$2,411.37
In 1974 through 1976, the deposits to the Bank of America account consisted of the following: 1974
1975
1976
Cash
$12,648.00
$ 5,555.00
$ 3,380.00
Credit cards
$ 2,441.95
$ 2,391.89
$ 1,958.79
Checks
$32,554.79
$32,350.11
$10,658.58
*52 In order to determine the character of the deposited items, the agents contacted the maker of the checks through letters and personal interviews. Through these contacts, all but approximately 22 percent of the 1974 checks, 8 percent of the 1975 checks, and 18 percent of the 1976 checks were documented as income. The agents excluded transfers between the two accounts. The wage checks paid to Mrs. Klingler were excluded from the bank deposits as such and were included in income separately. As to checks deposited in petitioners' accounts but made payable to persons or entities other than petitioners, the Stardust, or the Farmhouse, the checks were excluded as non-income items if the payee of the third party checks could not be located and questioned as to the purpose of the checks. The following table shows the reductions in total deposits attributable to nontaxable sources or specific items of income included in other adjustments: 1973
1974
1975
1976
Transfers
$1,950.00
$ 3,600.00
$ 2,350.00
$2,150.00
Wages
2,105.24
3,957.34
308.14
2,908.98
Third party
1,639.07
1,534.36
590.96
Check cashing
4,191.06
710.35
316.07
Other
1,424.52
19,133.53
83.00
Specific items
212.50
170.00
Reduction
$4,055.24
$15,024.49
$24,206.38
$6,049.01
*53 The following table shows for 1973 through 1976 the net taxable deposits into petitioners' bank accounts computed under the above-described procedure: 1973
1974
1975
1976
Total deposits
$64,663.59
$51,285.23
$42,802.80
$18,408.74
Reduction
4,055.24
15,024.49
24,206.38
6,049.01
Net deposits
$60,608.35
$36,260.74
$18,596.42
$12,359.73
When petitioners were attempting to sell the Farmhouse Motel, they completed a listing agreement stating that the Farmhouse's income for the period of June 1973 to June 1974 was $35,000. Petitioners told the purchaser of the Farmhouse that they grossed between $28,000 and $35,000 from its operation. Mr. Klingler and the purchaser, working together, reconstructed petitioners' bank books and determined that the income from both motels was about $60,000 for the year; of that amount about $30,000 was attributable to the Farmhouse. They reconstructed the Farmhouse's operating expenses and arrived at a figure of $6,671.59 for the year ended October 3, 1974. Mrs. Klingler confirmed that petitioners made a good living from the motel. In the first two quarters of his operation of the Farmhouse, the purchaser, *54 who had never before operated a motel, grossed $24,000 and in 1976 grossed $46,000. When petitioners were preparing to sell the Stardust Motel, they completed a listing agreement stating that, for the period July 1973 to July 1974, the Stardust's income was $32,000 and that the operating expenses were $6,842. Petitioners told the purchaser of the Stardust that they grossed about $30,000 annually from its operation. The purchaser had never before operated a motel, and he had gross income in excess of $30,000 from his first year of operation. Many of petitioners' customers paid their bills with cash. Petitioners used some of the cash to pay personal expenses and did not deposit all of the cash into bank accounts. 3. Sale of Rental House
In January 1972, petitioners purchased the rental house at 2230 Spring Street for $9,000 and incurred closing costs of $94. On February 20, 1974, petitioners sold the rental house and received $12,210 in net proceeds. In computing allowable depreciation, respondent allocated 70 percent of petitioners' basis to the land and 30 percent to the building and used straight-line depreciation over a useful life of 20 years, arriving at allowable *55 depreciation of $121 for 1972. The allowed depreciation for 1973 and for the first 51 days of 1974 to the date of the sale was $136 and $19, respectively. Petitioners have not credibly shown any further adjustments to the basis. Petitioners had capital gain for 1974 of $3,392 of which $1,696 is taxable. During 1975, petitioners sold a second deed of trust on the rental house and incurred a short-term capital loss in the amount of $1,699.97. 4. Sale of Stardust Motel
In June 1971, petitioners bought the Stardust Motel for $62,500. In October 1976, petitioners sold the Stardust and received net proceeds of $129,137. In computing petitioners' basis for the Stardust, respondent allocated $30,835 of the purchase price to the buildings and used straight-line depreciation over a useful life of 20 years. Respondent allocated $6,922 of the purchase price to the personal property and utilized straight-line depreciation over a useful life of 5 years. The remaining $25,172 of the purchase price was allocated to the land. Petitioners' allowable depreciation on the Stardust for 1971 and 1972 was $4,048. The depreciation allowed for both 1973 and 1974 was $2,926. The depreciation *56 allowed for 1975 was $2,826 and for 1976 to the date of the sale was $2,051. Petitioners have offered no records or other credible evidence to support any other adjustments to their basis for the Stardust. Petitioners had a gain on the sale of the Stardust Motel for 1976 of $80,985 of which $6,826 was ordinary income and $74,159 was capital gain. During 1976, petitioners sold a fourth trust deed on the Stardust and incurred a short-term capital loss of $23,119.12. Taking into account the section 1202 deduction, petitioner had a taxable gain of $55,465 from the sale of the Stardust in 1976. 5. Sale of the Farmhouse Hotel
In March 1972, petitioners bought the Farmhouse Motel for $96,900 and incurred closing costs on the purchase in the amount of $144. They sold the Farmhouse on April 17, 1975, for $121,000, incurred selling expenses of $7,923, and realized proceeds of $113,077 from the sale. In computing petitioners' basis for the Farmhouse, respondent allocated $28,141 of the purchase price to the buildings and utilized straight-line depreciation over a useful life of 20 years. Respondent allocated $20,382 of the purchase price to the personal property and utilized *57 straight-line depreciation over a useful life of 5 years. The remaining $48,521 of the purchase price was allocated to the land. Petitioners' allowable depreciation on the Farmhouse for 1972 was $4,989. The allowed depreciation for both 1973 and 1974 was $5,264. For 1976, the allowed depreciation to the date of the sale was $1,529. Petitioners offered no records or other credible evidence to establish any further adjustments to the basis of the Farmhouse Motel. The furniture and fixtures were old and had been poorly maintained. Petitioners had a gain on the Farmhouse Motel in 1975 of $33,079, of which $12,823 was ordinary income and $20,256 was capital gain. Taking into account the section 1202 deduction, petitioners' taxable gain from the sale of the Farmhouse in 1975 was $23,801. 6. Deductible Expenses
Petitioners are entitled to the following deductions in computing their taxable income: 1973
1974
1975
1976
Interest [1]
$ 7,382
$ 7,371
$ 3,896
$ 1,686
Real estate tax [1]
1,854
2,646
1,090
2,980
Bed taxes
1,368
Operating expenses:
Farmhouse
6,672
6,672
[2] 1,964
Stardust
6,842
6,842
8,000
[3] 6,086
Bank charges
120
270
221
142
Total expense
deductions
$22,870
$23,801
$16,539
$10,894
*58 The following table summarizes the Court's determination of petitioners' adjusted gross income: 1973
1974
1975
1976
Net bank deposits
$60,608.75
$36,260.74
$ 18,596.42 $12,359.73 Wages
2,590.00
5,535.22
315.50 3,189.98 Interest income
332.40
Total
$63,198.75
$42,128.36
$ 18,911.92 $15,549.71 Less: Expenses
22,870.00
23,801.00
16,539.00 10,894.00 Depreciation: Rental house
136.00
19.00
sold
sold
Farmhouse
5,264.00
5,264.00
1,529.00 sold
Stardust
2,926.00
2,926.00
2,826.00 2,051.00 Total
$ 8,326.00
$ 8,209.00
$ 4,355.00 $ 2,051.00 Total business expenses
and depreciation
31,196.00
32,010.00
20,894.00 12,945.00 Net income
$32,002.75
$10,118.38
$ (1,982.08)
$ 2,604.71 Additional income
Sale of rental
1,696.00
Sale of trust deed
(1,699.97)
Sale of Farmhouse
23,801.00 Sale of Stardust
55,465.00 Sale of trust deed
(23,120.00)
Adjusted gross income
$32,002.75
$11,814.36
$ 20,118.95 34,949.71 *59 In determining the deficiencies in dispute, respondent divided all income equally between petitioners because they were residents of California, a community property State, and allowed them the standard deduction. For 1973, respondent allowed each petitioner one personal exemption deduction, and for 1974, 1975, and 1976, allowed Mr. Klingler two personal exemption deductions and Mrs. Klingler one. All other deductions were divided equally. In addition, respondent determined the additions to tax set forth above. OPINION 1. The Deficiencies
Because petitioners maintained no books and records on their income and deductions for 1973 through 1976, respondent determined their income by use of the bank deposits method. Though not conclusive, bank deposits are prima facie evidence of income. See Boyett v. Commissioner,204 F.2d 205 (5th Cir. 1953), affg. a Memorandum Opinion of this Court; Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1978). The parties have stipulated to several adjustments to *60 respondent's reconstruction of petitioners' income and the summary table showing petitioners' adjusted gross income reflects those adjustments. The burden of proving any further adjustments rests with petitioners. Welch v. Helvering,291 U.S. 111 (1933); Estate of Mason v. Commissioner,64 T.C. at 657. They have not carried that burden, and we are convinced that petitioners had at least as much income as we have shown in the summary table. In reconstructing petitioners' gross income by use of the bank deposits method, the IRS agents took great care to assure as high a degree of accuracy as possible. As detailed in our findings, they studied the composition of each deposit, contacted the makers of all checks included in each deposit, and eliminated all checks from receipts which could not be verified as income. Similarly, if the payee of third party checks could not be located and questioned as to the purpose of the checks, the checks were excluded as nonincome items. Transfers between accounts were also eliminated as were other items brought into income as specific amounts. Petitioners showed no errors in the agents' analysis and we are convinced *61 that petitioners had income in amounts as much as the amounts reflected in the agents' analysis as modified by the stipulation. Mr. Klingler testified at length about the unfavorable economic conditions in Paso Robles, California, during 1973 through 1976 and its effect on the motel business. He also testified that he made numerous expensive improvements to the rental house and the two motels during those years, contending that the alleged expenditures reduced the taxable income from the motels and increased the adjusted basis used for computing the gain on the sale of the motels. In giving this testimony, relating to no less than 60 individual items ranging in amounts of alleged expenditures from $50 to $3,050 per item, Mr. Klingler introduced no substantiating records and presented no other corroborating evidence of any kind. Nor did he credibly explain where he got the money to improve his properties if, as he also testified, he was losing money from their operation. The purchaser of the Stardust Motel contradicted much of Mr. Klingler's testimony as to many of the claimed improvements. The purchaser testified, for example, that, when he bought the Stardust, the carpets were *62 5 to 10 years old; the television sets were over 10 years old; the air-conditioners were installed when the building was originally constructed; the kitchen floors had old tile and old vinyl; the bathroom floors were not tiled at all; the storage cabinets and refrigerators were old; and the gas heaters were in poor condition. We found the purchaser's testimony to be credible. Similarly, Mr. Klingler's testimony about improvements to the Farmhouse is substantially contradicted by the testimony of the purchaser of that motel. As in the case of the Stardust, the Farmhouse purchaser's testimony deals with most of the individual items for which Mr. Klingler testified he made expenditures and refutes Mr. Klingler's assertions. Respondent's bank deposits analysis is basically consistent with Mr. Klingler's own representations in agreements listing the motels for sale -- that the Farmhouse grossed $35,000 from June 1973 to June 1974 and that the Stardust grossed $32,000 per year. Similar representations were made to purchasers of the two motels during the course of their negotiations with petitioners, and Mr. Klingler produced bank records for the purchaser of the Farmhouse to confirm *63 that the two motels were producing about $60,000 per year. The bank deposits analysis is further confirmed by the incomes realized by the purchasers in the periods following their acquisitions of the motels. Also, the costs of operating the motels set forth in our findings are in line with the representations made in the listing agreements and representations Mr. Klingler made to the purchasers. We are convinced that the summary table set forth in our findings on petitioners' income is reasonable and is, indeed, a conservative determination of petitioners' taxable income. 2. Self-Employment Tax
Section 1401(a) provides for the imposition of a tax on self-employment income. Section 1402(a) defines net earnings from self-employment to mean gross income derived by an individual from any trade or business less the allowable deductions attributable to such business. Under section 1402(a)(5), where the income from a trade or business is community income, as in this case, all of the gross income and the deductions attributable to such income shall be treated as the gross income of the *64 husband unless the wife exercises substantially all of the management and control of the trade or business. Respondent determined that Mr. Klingler is liable for the self-employment tax for 1973 and 1974. Mr. Klingler has not shown that he is not liable for the tax. 3. Additions to Tax for Fraud
Section 6653(b) provides for the imposition of a 50-percent addition to tax if any part of the underpayment of tax is "due to fraud." By fraud is meant the specific intent to evade taxes known to be owing carried out by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Respondent has the burden of proving, by clear and convincing evidence, that some part of an underpayment of tax for each year was due to fraud. Sec. 7454(a); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent has carried his burden of proof. First, petitioners *65 have not filed Federal income tax returns since 1967 and, at least during the 4 years in controversy, they clearly had sufficient income to be obligated to do so. Mrs. Klingler alone had sufficient income from her teaching position in 3 of the 4 years to require a return. This failure to file returns that were due for these 4 consecutive years, though not enough alone, is "persuasive evidence of an intent to defraud the government." Stoltzfus v. United States,supra at 1005; Grosshandler v. Commissioner,75 T.C. 1, 19 (1980). Second, petitioner failed to keep adequate books and records of their income-producing activities as required by law. Sec. 6001. Such failure is a badge of fraud. Spies v. United States,317 U.S. 492, 499 (1943); Powell v. Granquist,252 F.2d 56, 59 (9th Cir. 1958). We give more than usual weight to this factor in this case. In his conversations with the purchasers of the two motels on the income *66 they derived from their operation, Mr. Klingler told both purchasers he did not keep any books and records and did not believe in paying taxes. His destruction of the occupancy cards, which if properly kept would have reflected his true receipts, prevented any precise determination of his taxable income. The clear inference from this evidence is that petitioners did not keep adequate books and records because they wished to frustrate any effort by the IRS to collect the taxes they owed. Third, when the IRS agents began an investigation of petitioners' tax liabilities, Mr. Klingler refused to cooperate with them in any way. At the outset, an agent sought to interview Mr. Klingler as to the date of his birth, as to whether he was married, his social security number, and as to any income tax returns he had filed.Mr. Klingler refused to answer any questions and told the agent that it was none of his business. When the agents sought to obtain records from the banking institutions, Mr. Klingler instructed the banks not to make the records available to the IRS, thereby necessitating, under the law as it then stood, enforcement proceedings in the United States District Court. *67 Petitioners did not at any point in the investigation volunteer any information or otherwise assist the IRS in determining their true tax liabilities. This failure to cooperate is evidence of petitioners' guilty knowledge. Millikin v. Commissioner,298 F.2d 830, 836 (4th Cir. 1962), affg. a Memorandum Opinion of this Court; Granat's Estate v. Commissioner,298 F.2d 397, 398 (2d Cir. 1962), affg. a Memorandum Opinion of this Court. Fourth, petitioners are both well educated individuals who had reason to know their obligations under the tax laws. Mr. Klingler is a West Point graduate. Mrs. Klingler has a masters degree from the University of California at Santa Barbara. The destruction of the motel occupancy cards, their deliberate failure to keep records, and other evidence, convince us that they were attempting to conceal the amount of their income and thereby frustrate the collection of the tax they owed. In fact, Mr. Klingler testified as follows: Q. So the fact that you believe tax money is being misspent has to do somehow with the fact that you will never make any money? A. That I *68 will never make enough money to incur a tax obligation. I will see to it that money cuts off so that I don't have to make enough money. Q. How do you intend to do that? A. I don't know. The Lord provides for me, and very well. Finally, a subpoena was served on Mrs. Klingler to appear and testify at the trial of this case. Mr. Klingler informed the Court that he refused to allow Mrs. Klingler "to appear and subject herself to the jurisdiction of IRS and to the machinations of the Tax Court." As a sanction, the Court ordered dismissal of the case as to Mrs. Klingler insofar as it related to the deficiencies and the section 6654 addition to tax. We think it is reasonable, as respondent urges, to infer that Mrs. Klingler's testimony, if presented, would not have been helpful to petitioners' position as to the fraud issue as well as the deficiency issue. Chiu v. Commissioner,84 T.C. 722, 731 (1985); Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Although the evidence as to Mrs. Klingler's fraud is not as clear as that of Mr. Klingler, we think it is sufficient. *69 She had substantial earnings from her work as a teacher and yet did not file income tax returns reporting her earnings. She participated in managing and running the motels, and she knew the motels were making money during at least part of the period. She represented to the purchasers that the motels had provided the family with a good living. Because Mrs. Klingler was involved in the negotiations for the sale of the motels, she knew a gain was realized on the sale of each property. Given these facts, her educational background, and her refusal to comply with the subpoena served on her, we think the evidence is sufficient to sustain the section 6653(b) additions to tax in her case as well as in Mr. Klingler's case. [2]
4. Section 6654 Addition to Tax
Section 6654 provides, subject to limited exceptions, for the imposition of an addition to tax for failure to pay estimated taxes. As shown by our findings, Mrs. Klingler *70 had taxes withheld from her wages as a school teacher for 1973, 1974, and 1975.Consistent with the applicable community property laws of California, one-half of the income and the withholdings was allocated to each of petitioners but these withholdings fall far short of covering petitioners' tax liabilities for the years before the Court. Petitioners have the burden of showing that one of the limited section 6654 exceptions applies, and they have not done so. In the absence of such a showing, imposition of the tax is mandatory. Grosshandler v. Commissioner,75 T.C. 1, 20-21 (1980). Accordingly, the applicability of the section 6654 addition to tax is sustained. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
1. In computing the allowable interest and real estate tax deductions, the amounts paid by petitioners have been reduced for petitioners' personal use of the motels as their residence. The amount of the reduction was taken into account in applying the standard deduction provisions. ↩
2. $6,672 divided by 365 times 106 days prior to sale. ↩
3. $8,000 divided by 365 times 274 days prior to sale.↩
2. Having concluded that the sec. 6653(b) additions to tax apply, we need not consider respondent's alternative sec. 6651(a)(1) and sec. 6653(a)↩ arguments.