ELLIS E. DAVIS AND EMMA DAVIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Davis v. Commissioner
Docket No. 9132-89
United States Tax Court
T.C. Memo 1991-603; 1991 Tax Ct. Memo LEXIS 650; 62 T.C.M. (CCH) 1395; T.C.M. (RIA) 91603; December 9, 1991, Filed *650 Decision will be entered for the petitioner. Gregory W. MacNabb, for the petitioners. Barbara S. Trethewy, for the respondent. CLAPP, Judge. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to tax
Year
Deficiency
Sec. 6653(b)
1978
$ 172,486
$ 86,243
1979
38,833
19,417
The issue for decision is whether petitioners filed false or fraudulent income tax returns for the taxable years 1978 and 1979 with the intent to evade tax, with the result that petitioner Ellis E. Davis is liable for additions to taxes under section 6653(b). (Respondent concedes that petitioner Emma Davis is not liable for the additions to taxes.) We hold that petitioners did not file false or fraudulent income tax returns. Since respondent's notice of deficiency was not timely, the deficiencies in income taxes are barred by the statute of limitations, in the absence of fraud. Sec. 6501. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. Unless otherwise noted, all Rule references are to the Tax Court Rules of *651 Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Ellis E. Davis and Emma Davis (petitioners) were husband and wife during the years at issue and resided in Tornillo, Texas, at the time of the filing of the petition. Petitioners filed joint Federal income tax returns for the years at issue. All references to petitioner in the singular are to Ellis E. Davis. Petitioner is a dairy farmer. As of 1978, petitioner had been in the dairy business off and on for approximately 18 years and had lived in Tornillo, Texas, for about 3 years. Sometime prior to 1978, petitioner sold certain properties not involved in this case on an installment basis. Petitioner's certified public accountant, Gerald Cohl (Cohl), informed petitioner that timely collections on these installment notes receivable would create a sizable liability for 1978, and therefore tax planning for that year should be considered. Sometime during 1978, Cohl offered petitioner a participation in a complex real estate transaction to help defer his current tax liability, but petitioner could not understand the deal and declined to participate. Petitioner told *652 Cohl that he would defer his current taxes by means of prepaid feed for cattle. A local banker, Harry Moore (Moore), referred petitioner to one of the bank's other customers, William Bonfantini (Bonfantini), about having cattle fed for him. Bonfantini was the president of Chuck Wagon Feed Lot, Inc. (Chuck Wagon), from its inception sometime prior to 1978 through 1980 and was in charge of its day-to-day operations. Moore explained Chuck Wagon's business to petitioner, and petitioner and Bonfantini discussed a cattle feeding program for petitioner when they met. Prior to this time, petitioner did not know and had no prior dealings with Bonfantini or Chuck Wagon. Chuck Wagon was a cattle feeding, sheltering, and processing operation located in Tornillo, Texas. Chuck Wagon did not own the cattle it processed but performed feeding, sheltering or "yardage" services, and other services for cattle owned by third parties. The other services included arranging veterinary services, identifying or branding, and dipping cattle. At any one time, Chuck Wagon would have between 1,000 and 18,000 cattle on the premises kept in various pens. On average, a herd would remain at the feed lot from *653 45 to 90 days. Cattle owners would bring their cattle to Chuck Wagon for processing from nearby States and Mexico, as well as from within Texas. During this time period, Chuck Wagon was not operated in an orderly, well-managed, businesslike manner. The paperwork portion of the business was always a chore. Observing the corporate formalities was an effort. The shareholders gave personal guarantees for some of Chuck Wagon's obligations. In fact, Bonfantini, as president of Chuck Wagon, referred to Chuck Wagon as a partnership and himself as a partner. In July or August 1978, petitioner and Bonfantini agreed that Chuck Wagon or one of its shareholders would sell cattle to petitioner. The agreement called for Chuck Wagon to house and feed the cattle, and then Chuck Wagon or one of its shareholders would repurchase the cattle from petitioner. The transaction was initiated and conducted in an informal manner. In fact, many cattle transactions in that part of the country at that time were conducted on an informal handshake basis. The original written memorial of the agreement between petitioner and Bonfantini documenting the first of two cattle transactions was titled "Collateral *654 Note: Bill of Sale -- w/Special Buy Back Clause." Petitioner and Bonfantini were noted as "lender" and "President of Chuck Wagon Feed Lot, Inc.," respectively, under their signatures on the single-page, typewritten document. The document was selected and prepared from a standard Texas note and typed by Chuck Wagon's part-time bookkeeper, Patricia Horan (Horan). It was dated August 16, 1978, executed by petitioner and Bonfantini, and notarized by Horan on August 17, 1978. Petitioner intended to receive tax benefits from the cattle deal and believed that the document he and Bonfantini had executed sufficiently reflected the intent of their agreement. Petitioner sent the document to Cohl for his review. Cohl informed petitioner that the intended transaction would provide the desired tax benefits, but that more precise documentation was required. Cohl advised petitioner to obtain counsel and have him draft contracts for the purchase, feeding, and resale of the cattle. Petitioner thereafter retained Guy Fields (Fields), an attorney with an LL.M in taxation. Fields prepared three documents, namely, a contract of sale, a bill of sale, and a promissory note. The contract of sale *655 between petitioner and Chuck Wagon was for 2,500 cross-breed cattle at a total purchase price of $ 787,185.36. The purchase price was broken down into a $ 20,000 cash downpayment, with the $ 767,185.36 balance due and payable by petitioner's interest-free, promissory note due March 1, 1979. The contract of sale was executed by petitioner as purchaser and Bonfantini as president of Chuck Wagon sometime after August 17, 1978, and was dated July 30, 1978. The undated bill of sale was for 2,500 cross-breed cattle, listed the consideration as $ 10, and was executed by petitioner and Bonfantini sometime after August 17, 1978. At or near this time, petitioner had his cattle brandmark properly recorded in the Record of Marks and Brands of El Paso County, Texas. This brandmark was used to brand petitioner's cattle at Chuck Wagon. Petitioner was billed monthly by Chuck Wagon for feeding and yardage during 1978. The invoices were prepared by Chuck Wagon, and petitioner was not involved with their preparation in any way. Chuck Wagon repurchased petitioner's cattle on or about February 2, 1979, for $ 330,000 in cash and forgiveness of petitioner's $ 767,185.36 note. Separately and in addition *656 to the cattle transactions, petitioner also loaned $ 100,000 to Chuck Wagon on February 15, 1979. The loan was evidenced by a 180-day note that differed significantly from the documentation of the cattle deals and required interest to be paid at 30-day intervals at 12-1/2 percent. Interest of $ 1,027 was paid monthly, the last installment of which was paid on August 14, 1979. This interest income was erroneously aggregated together with the other proceeds received on the sale of petitioner's cattle back to Chuck Wagon in 1979 when the gain on the cattle deal was calculated by petitioner's accountant. Petitioner purchased 2,500 additional cattle in 1979 for $ 350,000. The lower purchase price reflected falling beef and cattle prices. Petitioner paid $ 250,000 in cash and forgave the $ 100,000 loan owed petitioner by Chuck Wagon. Petitioner was billed by Chuck Wagon during the last half of 1979 for feeding and yardage in a fashion similar to the earlier cattle deal, although these invoices were less detailed. In 1980, petitioner resold the cattle to Chuck Wagon for $ 380,000, receiving $ 100,000 in cash at that time, leaving a balance due petitioner of $ 280,000. Petitioners' *657 claimed deductions for feeding and yardage of their cattle in 1978 and 1979 and reported gains on the two sales of cattle in 1979 and 1980. The proceeds and gains are as follows: 1978 Cattle Deal
Petitioner's
purchase price in 1978:
Cash payment $ 300,000
Prepaid feed ($ 280,000)
$ 20,000
Petitioner's note
767,185
Total
$ 787,185
Petitioner's
sales price in 1979:
Cash payment received
$ 330,000
Cancellation of petitioner's
note owed to Chuck Wagon
767,185
Total
$ 1,097,185
Calculation
of gain:
Amount realized
$ 1,097,185
Less adjusted basis
787,185
Gain:
$ 310,000
6 months of interest received
on the $ 100,000 loan (misreported
as proceeds rather than interest
income)
$ 6,165
Gain from sale of cattle reported
on petitioner's 1978 return
$ 316,165
1979 Cattle Deal
Petitioner's
purchase price in 1979:
Cash payment
$ 250,000
Application of loan amount due to
petitioners by Chuck Wagon
towards purchase price
100,000
Total
$ 350,000
Petitioner's
sales price in 1980:
Cash payment
$ 100,000
Reflected as a receivable on
petitioner's books (but never
collected from Chuck Wagon)
280,000
$ 380,000
As the figures *658 reflect, the $ 100,000 note due to petitioner was rolled over into the 1979 cattle deal. Petitioner's books as kept by his accountant reflect that the $ 100,000 receipt was reported as proceeds along with the sale of other livestock on petitioners' 1980 tax return, but did not include any of the basis. Petitioner's accountant recorded the $ 280,000 due from Chuck Wagon as a receivable, which was never collected from Chuck Wagon. [1]
Chuck Wagon was owned by Bonfantini and three other individuals, Phil Stadtler, Tom Craven, and Pete *659 Pascoe. Each of these three individuals was an officer of the corporation, but none was involved with the daily operations of Chuck Wagon. [2] All of these persons either owned cattle individually or owned corporations that owned cattle. Chuck Wagon, as a separate corporate entity, did not own cattle and was not in the business of buying and selling cattle. Bonfantini sold cattle to petitioner in the name of Chuck Wagon, believing that he and the other shareholders (described by Bonfantini as "partners") were acting on behalf of Chuck Wagon with respect to cattle that they had purchased. Chuck Wagon's shareholders, therefore, supplied their cattle to fulfill Chuck Wagon's obligation as if they were Chuck Wagon's cattle. Petitioner's educational background was limited to about eighth grade. He was not a knowledgeable investor. Respondent issued a notice of deficiency for the tax years *660 1978 and 1979 to petitioners dated February 16, 1989. OPINION Section 6501(a) provides generally that the amount of any tax imposed by title 26 must be assessed within 3 years of the filing of the return. Section 6501(c)(1) provides an exception to the general rule in the case of a "false or fraudulent return with the intent to evade tax." Assessment may be made at any time where a false or fraudulent return is filed. Sec. 6501(c)(1). Respondent issued a notice of deficiency to petitioners for the taxable years 1978 and 1979 dated February 16, 1989, well beyond the expiration of the section 6501(a) general 3-year limitations periods for those years. Therefore, we must decide as a threshold question whether petitioners filed "false or fraudulent returns with the intent to evade tax" within the meaning of section 6501(c)(1). Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Respondent's burden under section 6501(c)(1) is the same one that he bears for the purposes of the additions to tax under section 6653(b). Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502, 505, 507 (10th Cir. 1973), *661 affg. a Memorandum Opinion of this Court. Therefore, respondent must establish by clear and convincing evidence that petitioners underpaid their taxes for the years at issue, and that some part of that underpayment was due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). The issue of fraud presents a factual question which must be decided on the basis of an examination of all the evidence in the record. Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Stone v. Commissioner, 56 T.C. 213, 224 (1971); Stratton v. Commissioner, 54 T.C. 255, 284, modified 54 T.C. 1371 (1970). Fraud is never presumed, but must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner, 55 T.C. 85 (1970); Cochran v. Commissioner, T.C. Memo 1989-102. Fraud may be proved by circumstantial evidence and inferences drawn from the record because direct proof of the taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492, 87 L. Ed. 418, 63 S. Ct. 364 (1943); Rowlee v. Commissioner, 80 T.C. 1111 (1983). *662 Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing, effectuated by conduct designed to conceal, mislead, or otherwise prevent the collection of such tax. Stoltzfus v. United States, 398 F.2d 1002 (3d Cir. 1968); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977). Fraudulent intent may be inferred from a pattern of conduct. Spies v. United States, supra at 499. A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See Otsuki v. Commissioner, 53 T.C. 96 (1969). Additionally, fraudulent intent is more easily inferred where the taxpayer is intelligent, educated, and knowledgeable about taxes. Simms v. Commissioner, 422 F.2d 340 (4th Cir. 1970), affg. a Memorandum Opinion of this Court; O'Connor v. Commissioner, 412 F.2d 304, 310 (2d Cir. 1969), affg. in part and revg. in part a Memorandum Opinion of this Court; Klingler v. Commissioner, T.C. Memo 1987-46. Respondent asks us to find that *663 petitioner never acquired an economic ownership interest in any cattle directly from Chuck Wagon as a corporate entity, and that no actual purchase, feeding, and sale of cattle occurred. According to respondent, petitioner's claimed deductions and gains are not supported by actual outlays for goods and services and are thus fraudulent. Respondent's conclusion that petitioner committed fraud in claiming deductions and reporting capital gains on cattle transactions, however, relies upon an inference. Respondent assumes that petitioner did not acquire an economic ownership interest in cattle from anyone and, therefore, did not incur expenses in connection with cattle or gains on sales of them. Rather, respondent argues that the transactions in this case were in fact loans by petitioner to Chuck Wagon resulting in totally different tax consequences. Respondent determined deficiencies for the years at issue based upon that conclusion. We disagree. Respondent has not proven by clear and convincing evidence that petitioner never acquired an economic ownership interest in cattle that were fed and housed at Chuck Wagon during 1978 through 1980. Respondent did not prove by clear and *664 convincing evidence that no cattle were supplied to Chuck Wagon by one or more of Chuck Wagon's shareholders for the cattle deals in question. Such action could be recharacterized as a capital contribution to Chuck Wagon by the contributing shareholder or shareholders. This would be consistent with the informal, unbusinesslike manner in which Chuck Wagon was operated. Such action might also be characterized as a direct sale. We need not decide that question here as the record is inconclusive, and such a determination is not relevant to the disposition of this case. See Katz v. Commissioner, 90 T.C. 1130 (1988); Speth v. Commissioner, T.C. Memo 1990-374. It is sufficient that we are convinced that respondent simply did not carry his burden of proof that petitioner did not buy and sell cattle as reported. In addition, respondent did not show that petitioner did not actually incur and pay expenses for feeding and storing cattle in which petitioner had a real economic ownership interest. Respondent has not established a pattern of deception, intent to conceal, or strong circumstantial evidence of fraud beyond the sloppy documentation of *665 petitioner's cattle transactions. As such, we hold that respondent did not prove by clear and convincing evidence that petitioner committed fraud. Respondent points to the ambiguous initial typewritten document executed by petitioner and Chuck Wagon as evidence that petitioner was concocting a fraudulent transaction and thereby intended to evade tax. Respondent also cites the fact that subsequent documentation clarifying the initial document was backdated. This fact, however, is unremarkable in light of the surrounding circumstances. Upon receipt of the initial document, petitioner's certified public accountant told petitioner that the desired tax benefits were available from the cattle transactions, but suggested that petitioner obtain counsel to prepare better documentation. Petitioner retained tax counsel to do just that. While we do not condone backdating documents, we do not find anything unusual or damning about backdating the contract documents prepared by petitioner's tax counsel in order to reflect the original transaction date or perhaps the beginning of the transaction month. Commercial transactions and agreements are often memorialized with written instruments *666 after the parties begin performance. This is not an unusual practice and does not necessarily indicate fraud. Amending or clarifying contract documents is similarly not uncommon. Respondent argues that the invoices for feed and yardage are fraudulent and do not represent actual services performed. Respondent asserts that this conclusion is supported by the testimony of Chuck Wagon's bookkeeper, Patricia Horan. She testified that, for example, Chuck Wagon's invoices to petitioner for feed and yardage reflect that the cattle stayed in particular pens longer than usual and were fed slightly different amounts during different periods. Given the fact that Chuck Wagon was not well operated or managed in a strict businesslike manner, we do not find these statements particularly probative of fraudulent activity. There is no conclusive evidence that petitioner's cattle did not exist and were not maintained and fed. There is no evidence that petitioner failed to pay the amounts charged to him by Chuck Wagon. In addition, we find that petitioner's treatment of the two cattle transactions was consistent both in the reporting of the capital gains on the sale of cattle and in the deductions *667 taken for feeding and yardage expenses. There was no attempt to hide this income. In fact, petitioner reported the $ 100,000 proceeds received from the sale of cattle back to Chuck Wagon in 1980 without taking account of any of the basis he had in the cattle. The record indicates that the maximum gain on the transaction would have been $ 30,000; thus it appears that petitioner may have defrauded himself. Again, such reporting is not consistent with fraud. While circumstantial evidence and inferences therefrom may cumulate to help prove fraud in some circumstances, mere suspicion and some unexplained circumstances do not establish fraud. Speth v. Commissioner, T.C. Memo 1990-374; Manzoli v. Commissioner, T.C. Memo 1988-299, affd. 904 F.2d 101 (1st Cir. 1990). After examination of all the evidence in the record, we hold that respondent has failed to show by clear and convincing evidence that petitioners filed false or fraudulent income tax returns for the taxable years at issue with the intent to evade tax. Therefore, respondent's notice of deficiency is not timely under section 6501(a). We also must address respondent's *668 attempt to introduce the ex parte affidavit of Pete Pascoe into evidence. Petitioner objected to its introduction on the grounds of hearsay. See Fed. R. Evid. 802. This Court's Rules exclude ex parte affidavits from evidence. Rule 143(b). Mr. Pascoe was deceased at the time of trial and therefore was unavailable under rule 804(a)(4) of the Federal Rules of Evidence. Respondent claimed that the affidavit should be admitted as an "other exception" under rule 804(b)(5) of the Federal Rules of Evidence. We decline to admit the affidavit. Rule 804(b) of the Federal Rules of Evidence enumerates the hearsay exceptions applicable when the declarant is unavailable. They are: (1) Former testimony where the party against whom the testimony is offered had an opportunity and motive to develop the testimony by direct, cross, or redirect examination; (2) statements under belief of impending death; (3) statements against interest; (4) statements of personal or family history; and (5) other exceptions where a statement is not specifically covered by any of the foregoing exceptions and has equivalent circumstantial guarantees of trustworthiness. Rule 804(b)(5) of the Federal Rules of Evidence *669 further requires that: (1) The statement be offered as evidence of a material fact; (2) the statement be more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) the general purpose of these rules and the interest of justice will best be served by admission of the statement into evidence. We hold that the Pascoe affidavit proffered by respondent is not admissible under the hearsay exception of rule 804(b)(5) of the Federal Rules of Evidence. The Pascoe affidavit is an ex parte affidavit offered against petitioner. Neither petitioner nor a predecessor in interest had an opportunity and similar motive to develop the testimony. We believe that the affidavit is not more probative on any point than other evidence which respondent could procure elsewhere through reasonable efforts. Specifically, we point to the Pascoe deposition taken in connection with the lawsuit between petitioner and Chuck Wagon when Pascoe was president of Chuck Wagon. That deposition has been admitted into evidence and considered in arriving at this opinion. The Pascoe deposition provided petitioner the opportunity to develop *670 Pascoe's testimony dealing with the cattle transactions. It is clearly admissible under rule 804(b)(1) of the Federal Rules of Evidence, the parties agreed to its admission, and we admitted it on that basis. The exception to the hearsay rule of rule 804(b)(5) of the Federal Rules of Evidence is to be used rarely, and then only in truly exceptional circumstances where the guarantees of trustworthiness are strong. In re Corrugated Container Antitrust Litigation, 756 F.2d 411 (5th Cir. 1985). The Pascoe affidavit was taken without opportunity for confrontation or cross-examination. Respondent has not shown any exceptional circumstances requiring admission of the Pascoe affidavit, and points to no particular circumstantial guarantees of trustworthiness. As such, we do not believe the general purposes of the Federal Rules of Evidence and the interests of justice are best served by admission of the Pascoe affidavit. We hold that petitioners did not file false or fraudulent returns for the years in issue, they are not liable for additions to tax under section 6653(b), and the deficiencies are barred by the statute of limitations. Sec. 6501. Decision will be *671 entered for the petitioner. Footnotes
1. The $ 280,000 amount due petitioner from Chuck Wagon was the subject of a lawsuit between those parties in Texas. A jury found for petitioner on the debt, but a Texas appellate court reversed on other grounds. Pete Pascoe, a shareholder of Chuck Wagon during the years at issue, gave a deposition regarding, inter alia, Chuck Wagon's underlying cattle transactions with petitioner. Both parties' counsel in that case conducted the deposition and were able to develop Pascoe's testimony.↩
2. Pete Pascoe, the secretary/treasurer of Chuck Wagon during the time period at issue, was deceased by the time of this trial.↩